UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS RAINEY AND JUDY RAINEY, CO-CONSERVATORS, ON BEHALF OF COLLEEN GAROT,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF SAN DIEGO et al.,<br><br>Defendants. | Case No.: 19-cv-01650-L-BLM<br><br>**ORDER GRANTING MOTION FOR GOOD FAITH SETTLEMENT DETERMINATION (ECF 180)** |

Pending before the Court in this action alleging violations of Plaintiffs' federal rights pursuant to 42 U.S.C. 1983 and violations of California law is Defendants' County of San Diego, William D. Gore, Steven Block, Arthur Doherty, Yaowaluck Hagg, Susan Conrad, Myra Rada-Gragasin, Christine Eser, M. Germono, Melissa Grant, Mabel Domingo, Ma Estavillo, Edna Gomez-Sanchez, and Helen Salter (collectively "County Defendants") Motion for Good Faith Settlement Determination. (Motion [ECF No. 180.]) Defendants Coast Hospitalist Medical Associates ("CHMA"), Coast Correctional Medical Group ("CCMG") Frieddrike Von Lintig, M.D., and Angelito Dela Cruz (collectively "CHMA Defendants") filed a Response in Opposition. (Coast Oppo. [ECF No. 183.]) Defendants Michael Stewart, PhD., and Liberty Healthcare of California (collectively "Liberty Defendants") also filed a Response in Opposition. (Liberty Oppo. [ECF No. 184.]) County

Defendants filed a Reply. (Reply [ECF No. 200.] The matter is submitted on the briefs without oral argument. *See* Civ. L. R. 7.1(d)(1). For the reasons stated below, County Defendants' Motion is granted.

## I.   BACKGROUND

On April 13, 2018, plaintiff Colleen Garot was arrested and taken to county jail (Fourth Amended Complaint at 8 (ECF 53)) At the time of her arrest, Ms. Garot displayed a black eye and forehead abrasions, and she claimed that these resulted from a neurological disorder and a fall five days earlier. (*Id.* at 8–9.) Early the next morning on April 14, Ms. Garot reported that she had fallen at some time in the night and "lost consciousness." (*Id.* at 9.) Medical staff noted a bump on the back of her head and gave her an icepack with instructions to return it "when done." (*Id.*) At about 11 p.m. that night, Ms. Garot was examined by Dr. Quoc Tran, who noted her multiple facial bruises and left-eye swelling. (*Id.*) The following day, April 15, Ms. Garot was placed in a safety cell because of her "repeated, nonsensical statements." (*Id.* at 10.) Over the next 36 hours, Ms. Garot's condition deteriorated: she hallucinated a cowboy and believed a dragonfly was on her arm. (*Id.* at 10–11.) At about 6:30 a.m. on April 16, 2018, she was observed walking naked around her cell, trying to climb the wall. (*Id.* at 11.) At 11:00 a.m., Dr. Friedrike Von Lintig examined Ms. Garot in her safety cell, but noted "no acute [m]edical issues." (*Id.*) Around 11:20 a.m., Ms. Garot suffered a seizure and was taken to the emergency room, where she was diagnosed with a skull fracture, a subdural hematoma, and encephalopathy. (*Id.*) She is now completely incapacitated. (*Id.*)

Ms. Garot's conservators sued the County of San Diego, its sheriff, and the numerous deputies and medical professionals with whom she had contact, alleging claims under 42 U.S.C. § 1983 and for professional negligence. (ECF 53.) Most of the defendants sued were employees of the County, but some were institutions—and their employees— with which the County had contracted to provide medical services. (ECF 200, at 9.) Plaintiff asserts that her past and future medical expenses likely exceed $8,400,000. (ECF

180-1, at 8.) She also seeks non-economic damages of an additional $16,800,000, exposing defendants to a total potential liability at trial of $25,200,000. (*Id.* at 9.)

Plaintiff has reached a settlement agreement with the County Defendants, which include the County of San Diego, its Sheriff William D. Gore, Steven Block, Arthur Doherty, Yaowaluck Hagg, Susan Conrad, Myra Rada-Gragasin, Christine Eser, Maria Germono, Melissa Grant, Mabel Domingo, Ma Estavillo, Edna Gomez-Sanchez, and Helen Salter. The settlement agreement provides that Ms. Garot will dismiss all claims against the County Defendants within seven days of a determination of good faith settlement by this Court. (ECF 180-2, at 6.) Within thirty days of that determination, the County of San Diego will pay $9,500,000 in consideration for the release of all claims that were raised or could have been raised against the County Defendants. Plaintiff and the County Defendants now seek a good faith determination under California Code of Civil Procedure sections 877 and 877.6 as to this settlement.

Four individual defendants would remain: Dr. Quoc Tran; Michael Stewart Ph.D., employed by institutional defendant Liberty Healthcare of California, Inc.; and Dr. Friedrike Von Lintig and nurse practitioner Angelito Dela Cruz, both employed by institutional defendants Coastal Hospitalist Medical Associates and Coast Correctional Medical Group. Dr. Quoc Tran does not oppose the good faith determination. Liberty Defendants and CHMA Defendants, together with their respective defendant employees, filed oppositions. (ECF 183, 184.)

## II.  DISCUSSION

Under California law, "[w]here a release . . . is given in good faith before . . . judgment to one or more of a number of tortfeasors claimed to be liable for the same tort, or to one or more other co-obligors mutually subject to contribution rights," the release shall "reduce the claims against the others in the amount stipulated by the release" and "discharge the party to whom it is given from all liability for any contribution to any other parties." Cal. Civ. Proc. Code § 877(a) & (b). A defendant may secure a determination that its settlement was reached in good faith by giving "notice of settlement to all parties and

to the court, together with an application for determination of good faith settlement." Cal. Civ. Proc. Code § 877.6(a)(2). Non-settling parties are then given an opportunity to contest the good faith of the settlement. *Id.* If a court determines the settlement was entered in good faith, "any other joint tortfeasor or co-obligor" is barred from "any further claims against the settling tortfeasor or co-obligor for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault." Cal. Civ. Proc. Code § 877.6(c). Federal courts hearing state-law claims based on supplemental jurisdiction apply sections 877 and 877.6, as substantive California law, to determinations of good faith settlement. *Mason & Dixon Intermodal, Inc. v. Lapmaster Int'l LLC*, 632 F.3d 1056, 1060 (9th Cir. 2011).

The court has broad discretion in deciding whether a settlement was made in good faith in the context of section 877.6. *Cahill v. San Diego Gas & Elec. Co.*, 194 Cal. App. 4th 939, 957 (2011). In making its determination, a court considers the factors set out in *Tech-Bilt v. Woodward-Clyde & Associates*, 38 Cal. 3d 488 (1985), which include: (1) "a rough approximation of plaintiffs' potential recovery and the settlor's proportionate liability"; (2) "the amount paid in settlement"; (3) "the allocation of settlement proceeds among plaintiffs"; (4) "a recognition that a settlor should pay less in settlement than he would if he were found liable after a trial"; (5) "the financial conditions and insurance policy limits of settling defendants"; and (6) any evidence of "collusion, fraud, or tortious conduct aimed to injure the interests of non-settling defendants." *Id.* at 499 ("*Tech-Bilt* Factors").

The court must base its determination on the information available at the time of settlement. *Id.* Once the settling defendant has made a showing of the settlement, the burden of proof shifts to the party asserting a lack of good faith. *City of Grand Terrace v. Super. Ct.*, 192 Cal. App. 3d 1251, 1261 (1987); *see also* Cal. Civ. Proc. Code § 877.6(d). That party must show "that the settlement is so far 'out of the ballpark' in relation to these factors as to be inconsistent with the equitable objectives of the statute" and that the

settlement was not made in good faith under section 877.6. *Tech-Bilt*, 38 Cal. 3d at 499–500.

The policy goals of section 877.6 "include both the encouragement of settlements and the equitable allocation of costs among multiple tortfeasors." *Id.* at 498–99. Yet these goals are often in "inherent tension," and the court's determination of good faith "plays a key role in harmonizing" these dual objectives. *Bay Development Ltd. v. Super. Ct.*, 50 Cal. 3d 1012, 1018–19 (1990).

Under current Ninth Circuit law, there is no federal right of indemnification or contribution on a claim arising under 42 U.S.C. § 1983. *Hoa v. Riley*, 78 F. Supp. 3d 1138, 1145–46 (N.D. Cal. 2015) (collecting cases). Nor does 42 U.S.C. § 1988 permit importing rights of contribution or indemnification on a § 1983 claim from state law. *Id.* at 1147–48. Therefore, when a court is assessing the reasonableness of a settlement that embraces both state-law negligence claims and § 1983 claims, it limits its analysis of potential contribution to the state-law claims. *See, e.g.*, *Frary v. Cnty. of Marin*, No. 12-CV-03928-MEJ, 2015 WL 3776394, at *3 (N.D. Cal. June 16, 2015) (confining *Tech-Bilt* analysis to potential liability under negligence claims and excluding claims arising under § 1983).

County Defendants contend that they have entered the settlement with Plaintiff in good faith, the settlement agreement is fair and reasonable, and a good faith settlement determination by the Court will bar all current and future cross-complaints against County Defendants for implied indemnity, partial indemnity, equitable indemnity, or declaratory relief based on principles of comparative fault. (Mot. at 1).

Defendants CHMA, CCMG, Von Lintig and DeLa Cruz (CHMA Defendants) and Defendants Michael Stewart and Liberty Healthcare (Liberty Defendants) oppose the settlement, arguing that the County Defendants have failed to comply with the requirement under section 877.6(b) of providing affidavits and expert testimony addressing the standard of care, liability, causation, or damages as to Defendant DelaCruz and Defendant Dr. Lintig. (CHMA Defendants Oppo. at 7-8 [ECF No. 183]; Liberty Defendants Oppo. at 12-13 [ECf No. 184.])   CHMA and Liberty Defendants further argue that the County

Defendants are 100% vicariously liable for actions of the healthcare providers because they were ostensible agents of the County. (CHMA Oppo. at 15; Liberty Oppo. at 17). CHMA Defendants contend that the County Defendants have "essentially unlimited funds to contribute to Plaintiff while the opposing Defendants only have a shared $1 million policy." (CHMA Oppo. at 15). The opposing Defendants note that the proposed settlement apportions 35% liability to County Defendants with the remaining Defendants being 65% liable, but that there is no expert opinion to support this proportional finding, the settlement was not the product of adverse negotiations including the opposing Defendants, and regardless of the Court's findings, the settlement apportionment is not binding because the jury will apportion fault amongst the non-settling and settling parties. (CHMA Oppo. at 19-20; Liberty Oppo. at 16-17).

A.   **Approximation of Plaintiff's Potential Recovery and Settling Defendants' Proportionate Liability**

To meet the standard of good faith, the settlement amount must be "within the reasonable range of the settling tortfeasor's proportional share of comparative liability for the plaintiff's injuries." *Tech-Bilt*, 38 Cal. 3d at 499. "California Civil Code section 1431.2(a) provides that liability for economic damages is joint and several, but liability for noneconomic damages is apportioned according to the principles of comparative fault." *C.B. v. City of Sonora*, 769 F.3d 1005, 1031 (9th Cir. 2014). California courts have interpreted California Civil Code section 1431.2 as limiting California Code of Civil Procedure section 877 to economic damages only. *See Greathouse v. Amcord, Inc.*, 35 Cal.App.4th 831, 838 (1995) ("It is now well established that Code of Civil Procedure section 877 allows [the defendants] to set off settlement payments only for economic damages against the jury's verdict. Settlement payments attributable to non-economic damages are not subject to the setoff"); *Espinoza v. Machonga*, 9 Cal.App.4th 268, 274 (1992) (explaining that there can be no offset for noneconomic damages because a

"plaintiff's valid 'claim' against one ... tortfeasor for non-economic damages can never be the liability of 'the others'"). [1]

A court is to determine whether the "settlement is grossly disproportionate to what a reasonable person at the time of settlement would estimate the settlor's liability to be." *City of Grand Terrace v. Superior Ct.,* 192 Cal. App. 3d 1251, 1262 (1987). A court must consider the amount to be paid to plaintiff in relation to the settling parties' approximate proportionate liability under the first, second, and fourth *Tech-Bilt* factors. The amount a plaintiff claims as damages is "not determinative in finding good faith." *West v. Super. Ct.*, 27 Cal. App. 4th 1625, 1636 (1994). Instead, the court makes a "'rough approximation' of what plaintiff would actually recover." *Id.* "[A] 'good faith' settlement does not call for perfect or even nearly perfect apportionment of liability." *N. Cnty. Contractor's Ass'n v. Touchstone Ins. Servs.*, 27 Cal. App. 4th 1085, 1090 (1994) (citation omitted). The settlement amount need only be "in the ballpark" of the settling party's proportionate share of liability. *Tech-Bilt*, 38 Cal.3d at 499.

### 1. Approximation of Plaintiff's Potential Recovery

Plaintiffs assert that Garot's past medical expenses likely exceed $800,000 at this time. (Mot. at 7 [ECF No. 180-1.])) Plaintiff's experts have opined that the present value of Garot's future care needs will exceed $7.6 million. (*Id.*) This totals $8,400,000 in past and future medical expenses that could be awarded to Plaintiffs at trial. (*Id.*) Plaintiffs also seek non-economic damages, including for pain and suffering and shortened life expectancy. (*Id.*) Plaintiffs claim that if a multiplier of two is applied to the alleged medical expenses, it yields a possible non-economic damages recovery of $16,800,000, and a total potential liability of $25,200,000. (*Id.* at 8). The County Defendants' settlement of $9.5

---

[1] "In professional negligence actions against health care providers, recovery of noneconomic damages is capped at $250,000." *Rashidi v. Moser*, 60 Cal. 4th 718, 727 (2014); *see also* Cal. Civ. Code § 3333.2. However, the $250,000 cap applies only to judgments awarding noneconomic damages, it does not limit recovery of noneconomic losses through settlements. (*Id.*)("Only noneconomic damages awarded in court are actually capped.")

million is well within the ballpark of their potential liability, particularly in light of the fact that settling parties often "pay less in settlement than they would if they were found liable after trial. *See Tech-Bilt*. 38 Cal. 3d at 499.

**2.     Settling Defendants' Proportionate Liability to Plaintiff**

"[A] 'good faith' settlement does not call for perfect or even nearly perfect apportionment of liability." *N. Cnty. Contractor's Assn.*, 27 Cal. App. 4th at 1091 (citation omitted). In addition to a settling defendant's liability to the plaintiff, "[p]otential liability for indemnity to a nonsettling defendant is an important consideration for the trial court in determining whether to approve a settlement by an alleged tortfeasor." *TSI Seismic Tenant Space, Inc. v. Super. Ct.*, 149 Cal. App. 4th 159, 166 (2007).

The County Defendants posit that the $9.5 million settlement payment is more than 35% of the $25.2 million potential liability. (Mot. at 8 [ECF 180-1.]) The opposing defendants seem to urge, in identical passages, that this allocation percentage is necessarily defective because it was not the product of an adverse negotiation that included them. (ECF 183, at 22; ECF 184, at 20.) While such a settlement allocation "may not be given presumptive effect unless it was the product of adverse negotiation," at the pretrial settlement stage, the settling parties need only furnish "an evidentiary showing of a rational basis for the allocations made . . . [reached] in an atmosphere of appropriate adverseness . . ." *Regan Roofing Co. v. Super. Ct.*, 21 Cal. App. 4th 1685, 1703-04 (1994). The opposing defendants cite no case law indicating that non-settling defendants must have personally participated in the process. A showing that the settlement negotiations themselves were adversarial in nature will suffice.

The agreement was reached after extensive arms-length settlement negotiations that started with the September 2021 mediation before the Honorable Joel. M. Pressman (Ret.) at Judicate West and continued with multiple settlement conferences before Judge Schopler. (Mot. Inman Dec. ¶ 2 [ECF No. 180-2.]) The parties continued to negotiate until the San Diego Board of Supervisors approved the proposed settlement on August 31, 2022.

(*Id*. at ¶ 3). The ongoing nature of the negotiations supports the conclusion that they were adversarial in nature.

Moreover, the County Defendants have sufficiently demonstrated a rational basis for the allocation of liability at which they arrived. Again, the only cause of action at issue here is the professional negligence of the medical providers. The deputies and nurses employed by the County had less healthcare training than the other individual Defendants in this action. These other Defendants—two doctors, a nurse practitioner, and a psychologist—were better situated than the County Defendants to identify Ms. Garot's symptoms as a sign of brain bleed. Thus, apportioning a higher percentage of total liability to non-settling Defendants is supported.

The opposing Defendants argue that expert declarations are required for determining the apportionment of liability, relying on *Mattco Forge, Inc. v. Arthur Young & Co.*, 38 Cal. App. 4th 1337 (1995). However, the court in *Mattco Forge* stated that the settling defendant must show, "through expert declarations *or other means*, that the proposed settlement is within the reasonable range permitted by the criterion of good faith." *Id.* at 1351. Here, the settling defendants submitted numerous deposition transcript excerpts that support a greater relative culpability on the part of the remaining defendants. For instance, arresting officer Deputy Steven Block testified that Garot did not appear to need immediate medical attention when he encountered her, "[t]hat her bruising appeared old; she was able to talk to us; she was answering questions precisely, concisely; and she was able to move on her own accord, without needing assistance." (Mot. Block Dep. Ex B 23:19-24. [ECF No. 180-2.] Deputy Block stated that "if the nurses at the jail thought that there was something else that needed to be done with that or it needed to be further evaluated, then I would have been told to bring Ms. Garot to the - - to a hospital for further evaluation." (*Id*. at 22:8-12.)

Nurse Yaowaluck Hagg, R.N, who evaluated Garot before the fall in jail, stated that she was oriented and alert, and could answer questions appropriately. (Mot. Hagg Dep. Ex. D. at 34:18-20 [ECF No. 180-2.]) Hagg observed that Garot had a mild smell of alcohol

on her breath and slurred speech due to the alcohol, but that she was "alert and followed" commands. (*Id*. at 34:5-22). According to Hagg, there was no medical indication that Garot had any neurological issues at that time. (*Id*.) Hagg scheduled Garot to be seen by the doctor for evaluation for the bruises and abrasions on her forehead. (*Id*. 35:15-19[ECF No. 180-2.]

In contrast, Dr. Quoc Tran saw Garot after her jail fall when she lost consciousness. He testified that he observed Garot's facial bruises, a bump on the back of her head, and her self-reported unsteady gait and tremors, concluding they were the result of "multiple falls" that happened due to "drug or alcohol abuse and also possibly withdrawal." (Mot. Tran Depo. at 72-74). However, Dr. Tran did not order alcohol withdrawal protocol, and did not order any further examination or testing. (*Id*. Tran Ex. H, at 74, 76 [ECF No. 180-2.]) Psychiatrist Dr. Michael Stewart examined Garot through the food flap of the safety cell and stated that she exhibited "contradicting and odd statements suggesting poor reality testing" and that she was hallucinating, but that because she did not appear to be at risk for harming herself or others, he ordered continued observation, but no medical intervention. (*Id*. Stewart Dep. Ex. J at 89-94). Dr. Friedrike Von Lintig, without reviewing her medical history, observed Garot in the safety cell noting that she was naked, "with her hair more or less over her face and looking past me and talking to a third-party, invisible third-party." (*Id*. Von Lintig Dep. at 144:13-17, 146:15-18.) Dr. Von Lintig did not order additional testing but instead concluded that Garot required follow-up as needed if there was a change in her medical status. (*Id*. at 151-152).

Moreover, and contrary to the opposing Defendants' assertions, there is expert testimony in the record which supports the allocation of liability at this stage. Plaintiff's medical expert Dr. Homer Venters testified that Dr. Von Lintig should have conducted, or referred Garot for, a more thorough examination upon seeing her act bizarrely, knowing she had suffered a head trauma. (Pl. Oppo. Mot. Sum. Judg. Venters Dep. Ex A at 141:14-22 [ECF No. 187-2.]) As to the Liberty Defendants, Dr. Venters noted that Michael Stewart, Ph.D, while not a medical doctor, should have noted that there was a problem with

Garot's behavior, including her unsteady gait and the prior head injury, which "are reasons to get people to a higher level of care." (*Id*. at 70-71:1-2).

Based on the record, the Court finds that the settling parties have demonstrated that the suggested apportionment of liability is supported at this stage in the proceedings and the "proposed settlement is within the reasonable range permitted by the criterion of good faith." *Mattco Forge,* 38 Cal. App. 4th at 1351. At the time of trial the jury will be asked to apportion fault amongst the non-settling and settling parties for purposes of calculating any credits or set-off, therefore this apportionment finding is for purposes of the good faith settlement determination. The County Defendants are offering to settle for an amount in excess of Ms. Garot's total economic damages, therefore, there is no potential jury allocation that could result in their paying any less after a full trial.

Because Plaintiffs' total potential recovery on the professional negligence claim is reasonably estimated at a minimum of $8,650,000 ($8,400,000 in economic damages plus $250,000 in non-economic damages under MICRA after judgement) and the value of the settlement is $9,500,000, the opposing Defendants have failed to carry their burden to show that that the settlement is "so far 'out of the ballpark' in relation to these factors as to be inconsistent with the equitable objectives of the statute" and that the settlement was not made in good faith under section 877.6. *Tech-Bilt*, 38 Cal. 3d at 499–500. The first, second, and fourth *Tech-Bilt* factors therefore favor a good faith determination.

3.      **Financial Condition and Insurance Policy Limits of Settling Defendants**

A court may find a lack of good faith when the settling defendant's insurance policy limits far exceed the settlement amount. *See, e.g.*, *Long Beach Mem'l Med. Ctr. v. Super. Ct.*, 874–75 (2009). The opposing defendants argue that because the County is self-insured, it has essentially "unlimited funds," and this fact should weigh against a determination that the proposed settlement was made in good faith. (ECF No. 183 at 21.) But this argument misconstrues the context of this *Tech-Bilt* factor, which spoke to situations that are the opposite of the one here: "[a] disproportionately low settlement figure is often reasonable in the case of a relatively insolvent, and uninsured, or underinsured, joint tortfeasor." 38

11

Cal. 3d at 499 (quotation marks and citation omitted). *See, e.g.*, *Aero-Crete, Inc. v. Super. Ct.*, 21 Cal. App. 4th 203, 208–09 (1993) ("[Settling defendant] was the proverbial turnip from which little if any blood was forthcoming in the event of an adverse judgment. Under the *Tech-Bilt* standards, a settlement which recouped anything of value could be properly found to be in good faith"); *Schmid v. Super. Ct.*, 205 Cal. App. 3d 1244 (1988) (finding the objectively disproportional settlement of a judgment-proof tortfeasor to be in good faith), because the County is solvent.

Moreover, courts have found this factor meaningful only when the amount offered in settlement was not proportional to the defendant's projected liability, or when there is other evidence of bad faith. *See Long Beach Mem'l*, 172 Cal. App. 4th at 873–75 (finding initially that the settlement amount was not proportional and only then proceeding to label the proposed payout of ten percent of policy limits as "not defensible"); *Mattco Forge, Inc.* 38 Cal. App. 4th at 1352–53 (finding first "no substantial evidence the subject settlement is in the ballpark" and only then noting that the proposed payment "represented a mere 14 percent of the available policy limits"). This is sensible. Were it otherwise, a settling defendant could be denied a good faith determination simply because it maintained very generous policy limits or had chosen to self-insure. To the extent that it is relevant here, this factor favors a determination of good faith.

**B.   Other *Tech-Bilt* Factors**

Finally, "the allocation of settlement proceeds among plaintiffs" is irrelevant here since there is only a single plaintiff. *Tech-Bilt,* 38 Cal. 3d at 499. And no party has alleged or presented any evidence of "collusion, fraud, or tortious conduct aimed to injure the interests of non-settling defendants." *Id.* The Court therefore finds no grounds for concluding that these factors weigh against a finding of good faith.

**C.   Vicarious Liability**

"It is well established that traditional vicarious liability rules ordinarily make principals or employers vicariously liable for acts of their agents or employees in the scope of their authority or employment." *Meyer v. Holley*, 537 U.S. 280, 285 (2003). In

California an agency is either actual or ostensible. Cal. Civ. Code § 2298. An agency is actual when "the agent is really employed by the principal," and ostensible when "the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him." *Id.* at §§ 2299, 3000.

The CHMA Defendants and Liberty Defendants argue that even if the County produced relevant expert testimony regarding medical negligence, it would have no effect on the determination of proportionality since the County is 100% vicariously liable for both defendants as the principal of the providers. (CHMA Oppo. at 13; Liberty Oppo. at 17). Opposing Defendants contend that "[b]y having a medical clinic staffed with medical professionals, the County holds itself out as a provider of medical care" and the healthcare providers "are akin to the emergency room physicians in a hospital setting since the patients do not have a choice in which provider they can go to for medical care," citing *Mejia v. Community Hospital of San Bernadino*, 99 Cal.App. 4th 1448, 1453 (Ct. App. 4th 2002). (CHMA Oppo. at 15; Liberty Oppo. at 19).

In response, County Defendants contend that principals are not liable to agents based on a theory of vicarious liability, but instead, vicarious liability attaches when a principal becomes liable to a plaintiff for the acts of an agent. (Reply at 7). Although Plaintiffs have asserted vicarious liability against the County of San Diego for the actions of its deputies and nurses, they have not asserted vicarious liability against any of the CHMA or Liberty Defendants. (*Id.* at 7-8). As between the County of San Diego and opposing Defendants, their relationship is governed by a contract for CHMA and Liberty Defendants to provide medical and mental health treatment to inmates. County Defendants argue that it would make more sense for them to seek indemnification from the opposing Defendants, than for the opposing Defendants to seek indemnification from the County Defendants. (*Id.* at 8).

Unlike the hospital in *Mejia*, the County Defendants did not hold themselves out as providers of medical and mental healthcare "akin to the emergency room physicians in a hospital setting." In *Mejia*, a radiologist misdiagnosed a patient who had a broken neck, leading to her paralysis. *Id.* at 1451. The radiologist was employed by a radiology medical

group, which was hired by the hospital to provide medical services to its patients. *Id*. The appellate court held that there was sufficient evidence of ostensible agency under California law to overturn the lower court's finding of a nonsuit in favor of the hospital because 1) the hospital held itself out to the public as a provider of medical care, and (2) the patient relied on the hospital to provide medical care. (*Id*. at 1454).

In contrast, the relationship between County Defendants and opposing Defendants is not commensurate with the relationship between the hospital and its medical providers in *Mejia*. Here, the primary purpose of the Vista Detention Facility, where Garot was housed by the County, is as a penological institution providing custody for individuals awaiting court proceedings, not as a medical center. While medical services are provided to inmates during custody if required, community members do not seek medical care at the facility. For purposes of proportionate liability in this good faith settlement determination, the Court finds that the theory of vicarious liability does not provide support for opposing Defendants contention that County Defendants are 100% liable for any damages.

### III. CONCLUSION AND ORDER

For the foregoing reasons, the Court finds that the settlement was entered in good faith, and the Court grants the Motion for Good Faith Settlement Determination.

**IT IS SO ORDERED**

Dated: March 21, 2023

_____
Hon. M. James Lorenz
United States District Judge