1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS RAINEY and JUDY RAINEY, Co-Conservators, on behalf of COLLEEN GAROT,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF SAN DIEGO, WILLIAM D. GORE, STEVEN BLOCK, ARTHUR DOHERTY, QUOC TRAN, M.D., MICHAEL STEWART, PH.D., FRIEDRIKE VON LINTIG, M.D., ANGELITO DELA CRUZ, YAOWALUCK HAGG, SUSAN ANGUITAY, LEAH GACHE, SUSAN CONRAD, MYRA RADA-GRAGASIN, CHRISTINE ESER, M. GERMONO, MELISSA GRANT, MABEL DOMINGO, MA ESTAVILLO, EDNA GOMEZ-SANCHEZ, HELEN SALTER, COASTAL HOSPITALIST MEDICAL ASSOCIATES, INC., LIBERTY HEALTHCARE OF CALIFORNIA, INC.,<br><br>Defendants. | Case No.:  19-cv-1650-L-BLM<br><br>**ORDER:**<br><br>**(1) DENYING MOTION FOR SUMMARY ADJUDICATION (ECF No. 165)**<br>**(2) DENYING MOTION FOR SUMMARY ADJUDICATION OF CROSSCLAIM (ECF No. 168)**<br>**(3) DENYING MOTION FOR SUMMARY ADJUDICATION (ECF No. 171)**<br>**(4) DENYING MOTION FOR SUMMARY ADJUDICATION OF CROSSCLAIM (ECF No. 172)**<br>**(5) GRANTING MOTION FOR SUMMARY ADJUDICATION OF CROSSCLAIM (ECF No. 175)**<br><br>**[ECF Nos. 165, 168, 171, 172, 175]** |

1

## I.   <u>INTRODUCTION</u>

The present case arises out of injuries suffered by Plaintiff Colleen Garot while in the custody of the County of San Diego over a period of four days.  Over those four days, Ms. Garot was medically evaluated in some form by Defendant Nurse Practitioner Angelito Dela Cruz ("NP Dela Cruz"), Defendant Quoc Tran, M.D. ("Dr. Tran"), Defendant psychologist Michael Stewart, Ph.D. ("Dr. Stewart"), and Defendant Friedrike Von Lintig, M.D. ("Dr. Von Lintig").  (*See generally* Pl.'s Fourth Am. Compl., ECF No. 53.)  NP Dela Cruz and Dr. Von Lintig were employees of Defendant Coast Correctional Medical Group ("CCMG")[1] and Dr. Stewart was an employee of Defendant Liberty Healthcare of California, Inc. ("Liberty") during the relevant time period.  (ECF Nos. 68, 73.)  Dr. Tran was an independent contractor.  (ECF No. 73.)  The term "Defendants" only refers to the moving Defendants, CCMG, Liberty, NP Dela Cruz, Dr. Stewart, and Dr. Von Lintig, for purposes of this Order.[2]

Ms. Garot, by and through her parents as guardians ad litem, brings claims against Defendants under 42 U.S.C. § 1983 for deliberate indifference to a substantial risk of harm to health in violation of the Eighth and Fourteenth Amendments and section 845.6 of the California Government Code, and professional negligence under California law. (*See generally* ECF No. 53.)  The CCMG Defendants filed a combined motion for summary adjudication of these claims as did Liberty with Dr. Stewart.  (ECF Nos. 165,

---

[1] The operative complaint names Coastal Hospitalist Medical Associates, Inc. ("CHMA") as a Defendant that rendered healthcare services to Ms. Garot.  (ECF No. 53, at 6.)  The Court later granted Ms. Garot's request to amend the operative complaint to substitute CCMG in place of CHMA.  (ECF Nos. 122, 123.)  The County's cross-complaint still names CHMA as a Cross-Defendant.  (ECF No. 64.) The relationship between CCMG and CHMA is disputed and further discussed below.  *See supra* Section V.C.  Regardless, NP Dela Cruz, Dr. Von Lintig, and CCMG are referred to collectively as "CCMG Defendants."

[2] Dr. Tran initially filed a motion for summary adjudication of Ms. Garot's claims but subsequently withdrew the motion.  (*See* ECF No. 234.)

171.).[3]  Ms. Garot filed an omnibus opposition.  (ECF No. 191.)  The CCMG Defendants filed a reply, (ECF No. 217), and Dr. Stewart and Liberty filed a reply, (ECF No. 198).

Defendant County of San Diego ("County") filed a cross-complaint against CHMA, the CCMG Defendants, Liberty, Dr. Stewart, and Dr. Tran seeking: (1) contractual indemnity as to Liberty, (2) equitable indemnity as to all Cross-Defendants, and (3) declaratory relief pursuant to 28 U.S.C. § 2201 as to all Cross-Defendants.  (ECF No. 64.)  The County filed a motion for summary adjudication on the issue of contractual indemnity only, (ECF No. 175), which was opposed by Liberty, (ECF No. 190), and the County replied, (ECF No. 209).

The CCMG Defendants, and Liberty and Dr. Stewart (collectively, "Cross-Defendants") filed motions for summary adjudication on the second and third claims for equitable indemnification and declaratory relief.  (ECF Nos. 168, 172).  The County filed oppositions, (ECF Nos. 188, 189), and the Cross-Defendants filed replies, (ECF Nos. 199, 213).[4]

In sum, the Court must resolve motions for summary adjudication on Ms. Garot's claims as to three medical providers, and three motions for summary adjudication on the County's crossclaims.  The Court has federal question jurisdiction over the federal constitutional claims and supplemental jurisdiction over the state law claims.  28 U.S.C. §§ 1331, 1367(a).   The Court decides the matters on the papers submitted and without oral argument.  *See* Civ. L. R. 7.1(d.1).  For the reasons stated below, the County's motion for summary adjudication against Liberty on the issue of contractual indemnity is **GRANTED**, and all other motions for summary adjudication are **DENIED**.

---

[3] Dr. Stewart and Liberty also move for summary adjudication of Ms. Garot's claim for failure to summon medical care under section 845.6 of the California Government Code.  (ECF No. 171, at 23–24.)  This claim was not brought against Dr. Stewart or Liberty, (ECF No. 53, at 19), and thus Dr. Stewart and Liberty's motion for summary adjudication of this claim is denied.

[4] Dr. Tran also filed a motion for summary adjudication of the equitable indemnification and declaratory relief claims but withdrew the motion.  (*See* ECF No. 234.)

## II.   FACTUAL BACKGROUND

### A.   The Arrest of Colleen Garot, April 13, 2018

On April 13, 2018, San Diego Sheriff's Deputies Steven Block and Arthur Doherty were dispatched to Plaintiff Colleen Garot's residence to serve an eviction. (ECF No. 170, at 16.)[5]  The deputies discovered that Ms. Garot had an outstanding misdemeanor arrest warrant. (*Id.*)  Body-worn camera captured the deputies' interactions with Ms. Garot. (*See* Pl.'s Video Ex. 1.)

In the footage from the body-worn camera, Ms. Garot appears with a large black "raccoon eye" over her left eye, abrasions on her forehead, and bruises on her arms. (*See* Pl.'s Video Ex. 1.)  Ms. Garot's speech in the video is slow and she stutters when she explains to the Deputies that she is sick and in "neurological hell." (*See generally* Pl.'s Video Ex. 1; ECF No. 191-3, at 227.)  As the deputies and Ms. Garot were leaving the residence, one of the deputies stated that Ms. Garot appeared shaky and declined to place Ms. Garot in cuffs so she could hold on to things as she walked. (ECF No. 191-3, at 246.)  Ms. Garot was then transported to the Vista Detention Facility ("VDF"). (ECF No. 170, at 16.)

### B.   Booking and Intake Screening, April 13, 2018

Upon arriving at VDF, Nurse Yaowaluck Hagg evaluated Ms. Garot during medical intake at 11:22 a.m. (ECF No. 165-2, at 31–48.)  Ms. Garot informed Nurse Hagg that she suffered from Hashimoto's disease, which she claimed was a neurological disorder. (*Id.* at 31.)  Ms. Garot also informed Nurse Hagg that she suffered from depression and was currently taking the psychiatric medications Lexapro and Seroquel. (*Id.* at 31, 46.)  Nurse Hagg noted that Ms. Garot had consumed alcohol that morning and had mild alcohol breath, and also that Ms. Garot's speech was slurred from the alcohol consumption. (*Id.* at 37, 40, 41.)

---

[5] Unless otherwise noted, all citations to the ECF document number refer to the electronic filing page number.

Nurse Hagg referred Ms. Garot for further evaluation due to her thyroid condition (Hashimoto's disease) and the bruise and abrasions on her face. (ECF No. 191-2, at 8.) In her note referring Ms. Garot to a nurse practitioner, Nurse Hagg wrote that Ms. Garot had a bruise on her left eye but that Ms. Garot denied a left-eye injury, saying that it was from her neurological disorder. (ECF No. 165-2, at 50.) Nurse Hagg also stated that Ms. Garot claimed the abrasion and redness on her forehead was from a fall five days before. (*Id.*) Additionally, Ms. Garot denied loss of consciousness, nausea, and vomiting but reported occasional dizziness. (*Id.*)

### C.   Examination by Nurse Practitioner Dela Cruz, April 13, 2018

Later the same day, at 10:22 p.m., NP Dela Cruz performed a sick call evaluation of Ms. Garot for the purpose of assessing Ms. Garot's stability due to the injury to her eye. (Dela Cruz Dep., at 32.)[6]  NP Dela Cruz reviewed Nurse Hagg's note prior to the examination. (*Id.* at 27–28.)  In Ms. Garot's medical chart, NP Dela Cruz noted "ecchymosis to forehead and left periorbital," or bruising to the forehead and area around the left eye which Ms. Garot stated was from her husband. (ECF No. 165-2, at 51; Dela Cruz Dep., at 48.)  NP Dela Cruz stated that type of bruising could be due to blunt force trauma or a bleeding disorder and that it was likely the result of blood pooling in that area. (Dela Cruz Dep., at 48–49, 75.)  NP Dela Cruz testified that such bruising can also be a sign of a basilar skull fracture, but that he did not believe Ms. Garot had a basilar fracture when he examined her based on his examination and history. (*Id.* at 49, 77.)

Additionally, NP Dela Cruz noted that Ms. Garot reported a history of vertigo (dizziness) for which she was taking Seroquel, followed by a question mark. (ECF No. 165-2, at 51.)  NP Dela Cruz found Ms. Garot's statement questionable because Seroquel is not typically prescribed for vertigo but generally for psychiatric conditions. (Dela Cruz

---

[6] *See* ECF No. 165-2, at 53–77; ECF No. 191- 2, at 14–42.  Throughout this Order the Court's citation to a deposition refers to the page number of the transcript.

Dep., at 41.)  NP Dela Cruz wrote that Ms. Garot did not report any pain or visual changes and did not have any other complaints.  (ECF No. 165-2, at 51.)

As part of the examination, NP Dela Cruz conducted a review of systems which typically includes examining the body, heart, lungs, neurological ("neuro") system, and abdomen.  (ECF No. 165-2, at 51; Dela Cruz Dep., at 45.)  The neuro exam entails asking the patient whether they have numbness or tingling and inquiring as to whether they are oriented as to the date and time.  (Dela Cruz Dep., at 70, 71.)  NP Dela Cruz did not document whether Ms. Garot was experiencing numbness or was oriented as to the date and time, but he did document that Ms. Garot's pupils were equally reactive, round, and reactive to light.  (ECF No. 165-2, at 51; Dela Cruz Dep., at 46–47, 51–52.)  Based on his observations NP Dela Cruz opined that Ms. Garot's neurological state was grossly intact: Ms. Garot was responding and moving her extremities appropriately, and her face movement and eyes were symmetrical.  (ECF No. 165-2, at 51; Dela Cruz Dep., at 59).

Ms. Garot's medical chart also indicated that she could move her extremities and was ambulating well, but NP Dela Cruz could not recall how he came to those conclusions.  (ECF No. 165-2, at 51; Dela Cruz Dep., at 55–56, 59–60.)  NP Dela Cruz ordered Ms. Garot undergo blood pressure checks per the nursing standard protocol because her vital signs revealed elevated blood pressure as well as a slightly elevated pulse.  (ECF No. 165-2, at 51; Dela Cruz Dep., at 35–36.)  NP Dela Cruz ultimately concluded that Ms. Garot was medically stable.  (Dela Cruz Dep., at 86.)

**D.   Ms. Garot's Fall and Examination by Dr. Tran, April 13–14, 2018**

According to a San Diego County Sheriff's Department Officer Report, Ms. Garot was observed lying on the floor of her cell at approximately 7:00 a.m. the next morning, April 14, 2018.  (ECF No. 191-2, at 95.)[7]  The deputy asked Ms. Garot what happened, and Ms. Garot replied that she fell off of her bunk and hit her head.  (*Id.*)  The deputy

---

[7] *See also* ECF No. 165-3, at 6.

testified that Ms. Garot fell from the top bunk. (*Id.* at 109.) The deputy checked Ms. Garot's head and felt a lump then helped her sit up. (*Id.* at 95.) Ms. Garot was "very shaky" but was able to get up and sit on the stool in her cell. (*Id.*) The deputy left to finish her security check then returned to escort Ms. Garot to medical. (*Id.*)

When the deputy returned, she asked Ms. Garot if she needed a wheelchair or if she could walk, and Ms. Garot replied that she could walk with assistance. (*Id.*) The deputy again observed that Ms. Garot was shaky and escorted Ms. Garot to medical while holding on to her arm and the back of her shirt. (*Id.*; *see also* Pl.'s Video Ex. 3.)

Once at medical, Ms. Garot was evaluated by Nurse Susan Anguitay. (ECF No. 191-1, at 217.)[8] Ms. Garot informed Nurse Anguitay that she lost consciousness when she fell. (*Id.*) Nurse Anguitay noted Ms. Garot's bruised eye and the abrasion on her forehead and documented that Ms. Garot's gait was ataxic meaning uncoordinated or unsteady. (*Id.*) Ms. Garot was given an ice pack and placed on the sick call list to be seen by an MD that day. (*Id.*)

A few hours after her evaluation by Nurse Anguitay, Ms. Garot was examined by Dr. Tran at 11:23 a.m. on April 14, 2018. (ECF No. 191-1, at 219.)[9] Dr. Tran testified that it was his custom and practice to review all prior medical charts for an inmate-patient before an examination, so he would have reviewed the notes from Nurse Hagg and NP Dela Cruz before examining Ms. Garot. (Tran. Dep., at 24, 33–34.)[10] Dr. Tran observed that Ms. Garot presented an unsteady gait that Dr. Tran theorized was due to drug or alcohol withdrawal. (ECF No. 191-1, at 219.) Dr. Tran also noted the bruises on Ms. Garot's face and the swelling around her eye. (*Id.*)

Dr. Tran testified that although he performed a review of Ms. Garot's systems, he only charted some of Ms. Garot's answers to his questions. (Tran Dep., at 47–49.)

---

[8] *See also* ECF No. 165-3, at 8.
[9] *See also* ECF No. 176-3, at 69.
[10] *See* ECF No. 176-3, at 71–82; ECF No. 191-2, at 111–38.

Particularly, Dr. Tran stated that he did not note all of Ms. Garot's negative responses but only recorded symptoms that he believed were pertinent. (*Id.* at 48–49.) Based on his examination, Dr. Tran concluded that Ms. Garot was medically stable but stated "continue to monitor" in her medical chart and included instructions for Ms. Garot to be assigned a bottom bunk. (ECF No. 191-1, at 219.) Dr. Tran also noted that if Ms. Garot was unsafe for housing she might have to be transferred to Las Colinas Detention Facility ("LCDF") or a medical isolation cell. (*Id.*)

### E. Examination by Dr. Stewart, Ph.D., April 15, 2018

According to an incident report Ms. Garot was observed the next morning, April 15, 2018, making nonsensical statements and acting erratically. (ECF No. 191-2, at 139.) Ms. Garot was hitting and kicking her cell door before calling the deputy station on the intercom and saying that she "felt like hurting herself." (*Id.*) Ms. Garot was then taken to medical where it was determined that she should be placed in a safety cell until she was seen and cleared by psych. (*Id.*; *see also* ECF No. 191-1, at 225.)

Later that day at approximately 3:10 p.m., psychologist Dr. Stewart evaluated Ms. Garot in the safety cell. (ECF No. 191-2, at 179; ECF No. 191-1, at 227–29.)[11] Dr. Stewart testified that in accordance with the customary process, Ms. Garot was inside the safety cell at the time of her evaluation while Dr. Stewart remained on the outside. (Stewart Dep., at 30–31.)[12] Prior to Dr. Stewart arriving, a deputy would have asked Ms. Garot to approach the door of the cell and sit against the wall that is just to the left of the door per typical procedures. (*Id.* at 33.) From there, Dr. Stewart would have either kneeled on the ground or sat on a stool outside the cell so that he could communicate with Ms. Garot through the food flap in the door. (*Id.* at 33–34.) Based on Dr. Stewart's practices, it is unlikely that he reviewed Ms. Garot's prior medical records before the evaluation. (*Id.* at 30.)

---

[11] *See also* ECF No 171-2, at 41–42.
[12] *See* ECF No. 191-2, at 141–168.

Dr. Stewart noted that Ms. Garot required prompting to cover herself appropriately when he began his assessment. (ECF No. 191-1, 228.) Ms. Garot engaged with fair eye contact and appeared alert and attentive but evidenced significant disorganized thought processes and gave an inconsistent self-report. (*Id.*) Ms. Garot also reported memory problems and had a poor grasp on reality. (*Id.*) She told Dr. Stewart that she was currently in a store and described seeing a dragon fly on her arm and a cowboy in her cell. (*Id.*) Ms. Garot denied any suicidal or homicidal ideation. (*Id.*)

Dr. Stewart opined that he was unable to reliably assess Ms. Garot's prior diagnosis or substance abuse history due to her contradictory statements. (*Id.*) He found that Ms. Garot was suffering from unspecified psychosis and that substance-induced psychosis could be a factor. (*Id.* at 229.) Possible substance-induced psychosis was suspected based on her arrest for being under the influence and the presentation of symptoms that could be the result of intoxication, withdrawal, or extended impact of a substance. (Stewart Dep., at 62.)

Dr. Stewart concluded that Ms. Garot presented a low risk of self-harm and could be cleared from the safety cell and move to enhanced observation housing ("EOH") with a follow-up in one day. (*Id.*) No EOH cells were available at the time, so it was arranged for Ms. Garot to be transferred to LCDF and placed in EOH there. (ECF No. 191-3, at 262.)

Video surveillance of Ms. Garot's removal from the safety cell a few hours after Dr. Stewart's evaluation shows Ms. Garot walking gingerly as she is escorted through the jail. (Pl.'s Video Exs. 4–5.) Ms. Garot appears unsteady as she shuffles down the hall while a deputy holds her arm. (*Id.*) Ms. Garot was transferred to LCDF at approximately 7:45 p.m. on the evening of April 15, 2018. (ECF No. 191-1, at 230.)

## F.   Examination by Dr. Von Lintig and Transfer to the Emergency Department, April 15–16, 2018

Upon arriving at LCDF, Ms. Garot was immediately placed in medical observation bed ("MOB") EOH until she was cleared by a psychiatrist. (ECF No. 191-3, at 264.)

According to an incident report, at approximately 11:00 p.m. on the night of her arrival Ms. Garot was observed by a deputy standing inside MOB EOH completely naked. (ECF No. 191-3, at 266.)[13]  Ms. Garot was yelling through the intercom that she needed to get out of there and the deputy was informed that Ms. Garot had previously rushed the door attempting to get out. (*Id.*)  About thirty minutes later, Ms. Garot was observed pacing aimlessly around the ward still naked. (*Id.*)  Ms. Garot became disruptive enough to wake another inmate and she can be seen getting hit in the head by another inmate. (*Id.*; Pl.'s Video Ex. 7.)

The decision was made to transfer Ms. Garot to a safer environment based on her unpredictable behavior. (ECF No. 191-3, at 267.)  When deputies entered the ward to remove Ms. Garot, she began shaking nervously. (*Id.*)  Ms. Garot was described as disoriented and unable to answer questions. (*Id.*)  Ms. Garot was placed in a safety cell and was to remain there until evaluated by the facility psychiatrist. (*Id.*)

At approximately 9:10 a.m. on the morning of April 16, 2018, Dr. Von Lintig assessed Ms. Garot in the safety cell. (ECF No. 191-2, at 175.)  Dr. Von Lintig was told that Ms. Garot was a newly transferred add-on patient to see in a safety cell and did not review her medical records prior to the assessment. (Von Lintig Dep., at 15, 18.)[14]  The objective of Dr. Von Lintig's assessment was to check for any acute medical concerns such as serious injuries or altered mental states. (*Id.* at 16–17.)

Dr. Von Lintig testified that County of San Diego policy prohibited her from entering Ms. Garot's safety cell during the assessment unless a time-consuming evacuation team was assembled. (*Id.* at 17.)  As a result, Dr. Von Lintig examined Ms. Garot through the window on the door of the cell and through the food flap. (*Id.* at 13.)  When Dr. Von Lintig approached Ms. Garot's cell, Ms. Garot was naked and her hair

---

[13] *See also* ECF No. 165-3, at 20.
[14] *See* ECF No. 191-3, at 153–169; ECF No. 165-3, at 27–58.

was hanging over her forehead, obstructing Dr. Von Lintig's view of the bruising on Ms. Garot's forehead.  (*Id.* at 12–13.)

Dr. Von Lintig reported that Ms. Garot was delusional-appearing and that she had no injuries except for the black eye.  (ECF No. 191-1, at 242.)[15]  According to Dr. Von Lintig, Ms. Garot was uncooperative and was looking past her speaking to an invisible third party.  (*Id.*)  Dr. Von Lintig believed that Ms. Garot was suffering from a psychiatric problem rather than a medical problem and concluded that Ms. Garot had "no acute [m]edical issues at [that] time."  (*Id.*; Von Lintig Dep., at 28–29.)

After Dr. Von Lintig's examination at 9:10 a.m., Ms. Garot was observed up and talking until 9:47 a.m.  (ECF No. 191-2, at 175.)  After that, deputies recorded every ten to fifteen minutes that Ms. Garot was sleeping.  (*Id.* at 175–76.)  A deputy approached Ms. Garot's cell at approximately 11:18 a.m. and saw Ms. Garot lying on her back purportedly seizing.  (ECF No. 191-3, at 171.)  The deputy summoned help.  (*Id.*)

Dr. Von Lintig responded to the deputy's call for help and arrived at Ms. Garot's cell to find that she was still seizing.  (ECF No. 191-1, at 245.)[16]  Dr. Von Lintig entered the cell and moved Ms. Garot's hair out of her face, revealing the full extent of Ms. Garot's head wound to Dr. Von Lintig for the first time.  (Von Lintig Dep., at 40–41.)  EMS arrived on the scene at approximately 11:35 a.m., and Ms. Garot was transported to the hospital ten minutes later.  (ECF No. 191-1, at 243–44.)

### G.   Observations of Ms. Garot, April 13–15, 2018

After Ms. Garot's hospitalization, San Diego County Sheriff's detectives interviewed female inmates who were housed with Ms. Garot at VDF.  One inmate described Ms. Garot as "really, really shaky" and acting strangely.  (ECF No. 191-3, at 180.)  Another inmate recounted having to help Ms. Garot write out medical requests because Ms. Garot was shaking so much.  (*Id.* at 173.)  Ms. Garot was also described as

---

[15] *See also* ECF No. 165-3, at 25.
[16] *See also* ECF No. 165-3, at 60.

"weak and brittle" and hardly able to hold herself up, requiring assistance to get up off of a chair.  (*Id.* at 199, 201.)  When told Ms. Garot was hospitalized, one inmate replied, "I'm assuming from being beaten . . . having, you know, I mean, a little bit of brain damage right now, I would think."  (*Id.* at 208.)  The inmate added "I mean, if you look at her face and head . . . being hit that hard, I would assume your brain would swell."  (*Id.*)

### H.   Ms. Garot's Current Condition

At the hospital Ms. Garot was diagnosed with a basilar skull fracture and left-sided subdural hematoma.  (ECF No. 165-4, at 25.)  Ms. Garot underwent surgery to evacuate the subdural hematoma but sustained permanent brain damage.  (*Id.*; ECF No. 53, at 11.)  Ms. Garot is now completely incapacitated.  (ECF No. 53, at 11.)

## III.   LEGAL STANDARD

### A.   Summary Judgment

Summary judgment is appropriate where the record, taken in the light most favorable to the nonmoving party, demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  A "material" fact is one "that might affect the outcome of the case," and an issue of material fact is "genuine" if "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

"A moving party without the ultimate burden of persuasion at trial . . . has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment."  *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  The moving party can carry its burden of production by either (1) presenting evidence that negates an essential element of the nonmoving party's case, or (2) by showing that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial.  *Id.*  If the moving party fails to discharge this initial burden, the nonmoving party may defeat summary judgment without producing anything.  *Id.* at 1102–03.

If, however, the moving party meets their initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient."). Rather, the nonmoving party must "go beyond the pleadings" and designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(e)).

"[T]he district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001). The Court is not obligated "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 12705, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co. of Am.*, 55 F.3d 247, 251 (7th Cir. 1995)).

## B.   Deliberate Indifference

As a threshold matter, Ms. Garot's claims are governed by the Eighth Amendment. *See Castro v. County of Los Angeles*, 833 F.3d 1060, 1067–68 (9th Cir. 2016) ("Inmates who sue prison officials for injuries suffered while in custody may do so under the Eighth Amendment's Cruel and Unusual Punishment Clause or, if not yet convicted, under the Fourteenth Amendment's Due Process Clause."); *see also Flores v. Mesenbourg*, 1997 WL 303277, at *1 (9th Cir. June 2, 1997) (holding that a convicted prisoner incarcerated for a parole violation "must rely on the Eighth Amendment to support his claim" because "[h]is original conviction is the authority under which he was confined after his parole").

To maintain an Eighth Amendment claim for inadequate prison medical care under 42 U.S.C. § 1983, a plaintiff must demonstrate "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Inherent in this type of claim is the requirement that a plaintiff must show both a "serious medical need" and "deliberate

indifference" on the defendant's part. *See Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). A "serious medical need" is one in which "failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *Id.* (citation omitted) (quoting *Estelle*, 429 U.S. at 104). There is no dispute that Ms. Garot's injuries constituted a serious medical need. The only issue then is whether Defendants' responses to that need rise to deliberate indifference.

"Deliberate indifference is a high legal standard" that goes beyond medical malpractice or negligence. *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). "Under this standard, an inadvertent failure to provide adequate medical care, differences of opinion in medical treatment, and harmless delays in treatment are not enough to sustain an Eighth Amendment claim." *Simmons v. G. Arnett*, 47 F.4th 927, 934 (9th Cir. 2022) (citations omitted). "Rather, to prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment was medically unacceptable under the circumstances, and was chosen in conscious disregard of an excessive risk to the prisoner's health." *Toguchi*, 391 F.3d at 1058. To be sure, the defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "[D]eliberate indifference to medical needs may be shown by circumstantial evidence when the facts are sufficient to demonstrate that a defendant actually knew of a risk of harm." *Lolli v. Cnty. of Orange*, 351 F.3d 410, 421 (9th Cir. 2003) (citing *Farmer*, 511 U.S. at 842).

Finally, "plaintiffs alleging deliberate indifference must also demonstrate that the defendants' actions were both an actual and proximate cause of their injuries." *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1074 (9th Cir. 2013). Conduct is an actual cause of injury "only if the injury would not have occurred 'but for' that conduct." *White v. Roper*, 901 F.2d 1501, 1505 (9th Cir. 1990). "Once it is established that the defendant's conduct has in fact been one of the causes of the plaintiff's injury, there remains the question whether the defendant should be legally responsible for the injury."

*Id.* at 1506 (quotation omitted).   A defendant's conduct "is not the proximate cause of [the plaintiff's] alleged injuries if another cause intervenes and supersedes his liability for the subsequent events." *Id.* But "foreseeable intervening causes will not supersede the defendant's responsibility." *Id.* (quotation omitted).   "'If reasonable persons could differ' on the question of causation then 'summary judgment is inappropriate and the question should be left to a jury.'" *Lemire*, 726 F.3d at 1080 (quoting *White*, 901 F.2d at 1506).

### C.  Professional Negligence

"The elements of a claim for professional negligence are: (1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence." *Paul v. Patton*, Cal. Rptr. 3d 830, 835 (2015) (quotation omitted).   "Because the standard of care in a medical malpractice case is a matter peculiarly within the knowledge of experts," California law requires expert testimony to "prove or disprove that the defendant performed in accordance with the standard of care unless the negligence is obvious to a layperson." *Johnson v. Superior Ct.*, 49 Cal. Rptr. 3d 52, 58 (2006) (quotations omitted).

## IV.  DISCUSSION

### A.  Deliberate Indifference

#### 1.  NP Dela Cruz

NP Dela Cruz maintains that he did not violate Ms. Garot's Eighth Amendment rights because he did not have a subjectively culpable state of mind to support such a claim, and his treatment did not objectively place Ms. Garot at risk of sufficiently serious harm.  (ECF No. 165-1, at 15–16.)  NP Dela Cruz argues that his performance of a full body assessment, including but not limited to neurological, eye, and extremities assessments, combined with his inquiry of Ms. Garot's bruising, demonstrates that he consciously addressed Ms. Garot's presentation to determine if there was a risk to her health.  (*Id.* at 16.)  NP Dela Cruz further points to the testimony of Ms. Garot's liability

1   expert Dr. Venters, who stated that a black eye without any behavioral disturbances or

2   abnormal vital signs is not a medical emergency in and of itself.  (Venters. Dep., at

3   141.)[17] According to NP Dela Cruz Ms. Garot did not exhibit any behavioral disturbances

4   upon presentation, nor did she exhibit an inability to walk or slurred speech.  (ECF No.

5   165-1, at 17.)  Therefore, NP Dela Cruz argues there was nothing in his evaluation which

6   should have resulted in Ms. Garot being sent to the emergency department.  (*Id.*)

7        Ms. Garot counters that NP Dela Cruz testified that Ms. Garot's raccoon eye could

8   indicate the presence of a basilar skull fracture particularly if the patient exhibited other

9   symptoms such as dizziness.  (ECF No. 191, at 57; Dela Cruz Dep., at 49–51.)[18]  Thus,

10   Ms. Garot asserts, a jury could find that NP Dela Cruz consciously disregarded a serious

11   risk of harm to Ms. Garot based on his awareness of her raccoon eye and Ms. Garot's

12   presentation of dizziness.  (ECF No. 191, at 57.)   Additionally Ms. Garot stresses that

13   summary judgment is improper for NP Dela Cruz because a critical factual dispute exists

14   regarding Ms. Garot's presentation and her symptoms at the time of NP Dela Cruz's

15   evaluation, and a reasonable jury could choose to disbelieve NP Dela Cruz's observations

16   based on other evidence including the observations of other inmates.  (*Id.* at 59.)

17        The Court agrees that summary adjudication is inappropriate due to underlying

18   material factual disputes.  One of Ms. Garot's experts, Dr. Lobatz, testified that the

19   symptoms of a subdural hematoma include outward signs of head trauma and other

20   symptoms such as headache, cognitive impairment, difficulties with balance, dizziness,

21   slurred speech, and confusion.[19]  (Lobatz Dep., at 15.)[20]  NP Dela Cruz acknowledged in

22   his deposition that a raccoon eye combined with even one or two other listed symptoms,

23   including dizziness, could indicate a basilar skull fracture.  (Dela Cruz Dep., at 50–51.)

---

25   [17] *See* ECF No. 165-4, at 62–90.

26   [18] *See* ECF No. 191-2, at 28–30.

27   [19] The Court need not address Dr. Tran and Dr. Stewart's objections to Dr. Lobatz's testimony as their objections only relate to Dr. Lobatz's ability to opine as to the applicable standard of care. (*See* ECF No. 198, at 5; ECF No. 214, at 2.)

28   [20] *See* ECF No. 191-1, at 105–141.

NP Dela Cruz reviewed Nurse Hagg's notes before his evaluation and was therefore on notice that Ms. Garot had reported occasional dizziness.  NP Dela Cruz also noted himself that Ms. Garot reported dizziness taking Seroquel.  Even though NP Dela Cruz was confused by Ms. Garot's explanation, it does not negate the fact that she reported dizziness.  NP Dela Cruz's failure to provide further medical care to Ms. Garot when she presented with the outward appearance of head trauma and one other symptom of a subdural hematoma, namely dizziness, could provide circumstantial evidence of deliberate indifference.  Thus, whether Ms. Garot was experiencing dizziness or confusion is a disputed issue of fact that is material because it bears on whether NP Dela Cruz's actions in failing to treat Ms. Garot as though she had a subdural hematoma was medically acceptable, and on what inferences NP Dela Cruz could have drawn at the time.

NP Dela Cruz testified that he performed a full neuro exam despite not reporting as such, and he additionally testified that he must have evaluated Ms. Garot's ability to move her extremities and ambulate because it was in his report.  (Dela Cruz Dep., at 45–46, 59–60.)  But the credibility of NP Dela Cruz's testimony is only suitable for determination by a jury, and it follows that whether NP Dela Cruz took the appropriate steps in light of his knowledge and the circumstances is also a question for the jury.  *See Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions.").

NP Dela Cruz also challenges the causal link between his actions and Ms. Garot's current condition.  (ECF No. 165-1, at 20.)  NP Dela Cruz attacks the proximate causation of Ms. Garot's injuries by arguing that the fall from her top bunk was an intervening event that broke the causal chain between NP Dela Cruz's evaluation and Ms. Garot's current injuries.  (*Id.* at 21.)  Even if Ms. Garot had a developing subdural hematoma at the time of his evaluation, NP Dela Cruz asserts Ms. Garot cannot prove that the ultimate outcome would be the same without the fall from the bunk.  (*Id.*)  NP Dela Cruz broadly argues that Ms. Garot cannot establish causation because she has not

shown that even if she were transported to the emergency department her condition would have been successfully diagnosed and treated.  (*Id.* at 23.)

Ms. Garot responds that a reasonable jury could conclude that NP Dela Cruz inflicted serious harm to Ms. Garot when he refused to have her transported to an emergency department because his failure to function as an appropriate "gatekeeper" initiated a chain of events that caused her catastrophic harm.  (ECF No. 191, at 60.)  This is based in part on an expert report from Dr. Lobatz, who stated that a hospital would have diagnosed Ms. Garot's subdural hematoma which was, at the time of NP Dela Cruz's evaluation, treatable with a high likelihood of good recovery.  (*Id.*; ECF No. 191-1, at 60.)  Additionally, NP Dela Cruz's failure to send Ms. Garot to the emergency department subjected her to unnecessary pain and suffering as her subdural hematoma expanded according to Ms. Garot.  (*Id.* at 61.)

The record is replete with factual disputes concerning causation.  For example, whether Ms. Garot was suffering from a subdural hematoma at the time she was seen by NP Dela Cruz, and whether it was treatable such that transporting Ms. Garot to the hospital would have changed the outcome are both material factual disputes that can only be resolved through expert testimony by a jury at trial.  Furthermore, it is a material dispute whether Ms. Garot's fall from the bunk was an intervening cause because if the fall was foreseeable due to her instability, then NP Dela Cruz would still be potentially liable.  Foreseeability in this context is a fact-intensive question that the Court is not suited to resolve on summary judgment.  *See White*, 901 F.2d at 1506 ("The issue as to whether a described consequence was 'foreseeable,' and the issue as to whether an intervening force was 'abnormal' are to be decided as issues of fact are decided." (quotation omitted)).  In sum, reasonable people could differ on the on the question of whether NP Dela Cruz's failure to call for Ms. Garot to be transported to an emergency department caused Ms. Garot's injuries, precluding summary adjudication of this issue.

19-cv-1650-L-BLM

## 2.   Dr. Stewart

The Court begins by addressing Liberty and Dr. Stewart's evidentiary objections of consequence. [21]  Liberty and Dr. Stewart contend that Ms. Garot's standard of care experts are not qualified to opine as to what Dr. Stewart should have done in the course of performing a suicide risk assessment on Ms. Garot.  (ECF No. 198, at 5.)  Ms. Garot designated three standard of care experts pertaining to Dr. Stewart, but the Court only considers testimony of one, Bonny J. Forrest, J.D., Ph.D., and thus only addresses objections to her testimony.

Liberty and Dr. Stewart attack Dr. Forrest's qualifications to render opinions concerning how Dr. Stewart conducted his in-custody suicide risk assessment of Ms. Garot.  (ECF No. 198, at 11.)  Dr. Forrest was asked in her deposition whether she has ever performed a suicide risk assessment of an inmate or detainee at the request of a correctional facility, and she responded that she had done more than one but did not feel comfortable going beyond that estimate.  (*Id.* at 9–10.)  Dr. Forrest also stated that the last time she saw an inmate or detainee in jail who was actively suicidal was more than twenty years ago.  (*Id.* at 10.)  Liberty and Dr. Stewart request Dr. Forrest's testimony be stricken based on this deposition testimony.

Federal Rule of Evidence 702 allows "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education" to testify.  Expert testimony must be both reliable and rooted in sound methodology.  Fed. R. Evid. 702.  "The party offering the expert bears the burden of establishing that Rule 702 is satisfied."  *Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*, No. 02-cv-2258-JM-AJB, 2007 WL 935703, at *4 (S.D. Cal. Mar. 7, 2007); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 n.10 (1993).  Liberty and Dr. Stewart only challenge Dr. Forrest's qualifications and not the reliability or methodology of her testimony.

---

[21] All objections to evidence not relied on by the Court are overruled.

"In the Ninth Circuit, an expert may be qualified to offer a particular opinion either as a result of practical training or academic experience." *McMorrow v. Mondelez Int'l, Inc.*, No. 17-CV-2327-BAS-JLB, 2020 WL 1237150, at *2 (S.D. Cal. Mar. 13, 2020) (citing *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994)).  "[T]he advisory committee notes emphasize that Rule 702 is broadly phrased and intended to embrace more than a narrow definition of qualified expert." *Thomas*, 42 F.3d at 1269.  A lack of particularized expertise goes to the weight accorded an expert's opinion, not the admissibility.  *United States v. Garcia*, 7 F.3d 885, 889 (9th Cir. 1993).

Dr. Forrest possesses an advanced degree with specializations in pediatric psychology and neuropsychology and has over twenty years of experience as a clinical and consulting psychologist.  (ECF No. 191-3, at 121–124.)  Dr. Forrest's academic training combined with her experience provides at least a "minimal foundation of knowledge, skill, and experience" to give expert testimony on the standard of care of a psychologist.  *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (quoting *Thomas*, 42 F.3d at 1269).

Liberty and Dr. Stewart also object to Dr. Forrest's testimony on the grounds that her testimony is predicated on the mistaken assumption that Dr. Stewart could have performed his assessment from inside Ms. Garot's cell, and that her testimony is cumulative.  (ECF No. 198, at 11, 23.)

First, the Court declines to strike Dr. Forrest's testimony due to an alleged mistake of fact.  The Federal Rule of Civil Procedure 702 advisory committee's note to the 2000 amendment states that the rule is "not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other."  After all, "[t]he weakness in the underpinnings of expert opinions may be developed upon cross-examination and such weakness goes to the weight and credibility of the testimony," not admissibility.  *Bergen v. F/V St. Patrick*, 816 F.2d 1345, 1352 (9th Cir. 1987).

Second, the nonmoving party need not produce evidence in a form that would be admissible at trial in order to avoid summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The Court is not convinced that Ms. Garot will be unable to present Dr. Forrest's testimony in an admissible form at trial. Limiting the testimony as cumulative is unwarranted and Liberty and Dr. Stewart's evidentiary objections to Dr. Forrest's testimony are overruled.

As for the merits of Dr. Stewart's motion, Dr. Stewart puts forth the same arguments as NP Dela Cruz: his course of treatment was not medically unacceptable under the circumstances, and he did not have a subjectively culpable state of mind to support Ms. Garot's claim. (ECF No. 171-1, at 15, 19.) Dr. Forrest opined that Dr. Stewart's actions fell below the standard of care because he failed to rule out a medical condition as a cause of Ms. Garot's behavioral issues. (ECF No. 191-3, at 11.) But Dr. Stewart argues that Dr. Forrest never stated that Ms. Garot's behavior issues were in fact due to a skull fracture and brain bleed, and without this evidence one cannot conclude that Dr. Stewart's diagnosis was wrong or medically unacceptable. (ECF No. 171-1, at 16.)

Dr. Forrest additionally stated that Dr. Stewart appeared to have assumed that Ms. Garot's behavior was more likely the result of substance abuse. (ECF No. 191-3, at 13.) This, says Dr. Stewart, is not the same as stating that he acted in conscious disregard of Ms. Garot's medical state. (ECF No. 171-1, at 20.) Dr. Stewart asserts that he did not act in place of a medical examiner, he did not supplant a medical examiner, and he did not see a psychiatric emergency. (*Id.*) Dr. Forrest never opined that a psychiatric emergency existed, and Ms. Garot did not attempt suicide. (*Id.*) Therefore, Dr. Stewart concludes that there is no evidence that he acted with conscious disregard. (*Id.*)

Ms. Garot calls attention to Dr. Stewart's acknowledgment that he uses the Diagnostic and Statistical Manual of Mental Disorders ("DSM") to diagnose patients after an assessment in jail. (Stewart Dep., at 69.) As Dr. Forrest noted, the DSM requires psychologists to rule out a medical condition that may account for the psychological

symptoms Dr. Stewart observed.  (ECF No. 191-3, at 12.)   Dr. Stewart made no attempt to rule out a medical condition as the cause of Ms. Garot's behavior and it is because of this, states Ms. Garot, that Dr. Stewart's actions were medically unacceptable.  (ECF No. 191, at 65.)  Ms. Garot makes the additional, broader argument that Dr. Stewart was obligated to ensure that Ms. Garot receive treatment at a hospital because her psychosis, whether medical or psychiatric in nature, constituted a medical emergency.  (*Id.* at 66.)

Going to Dr. Stewart's state of mind, Ms. Garot asserts that a reasonable jury could find that Dr. Stewart suspected Ms. Garot had a medical condition based on her raccoon eye and her presentation during the examination.  (*Id.*)  Further, a jury could find that Dr. Stewart consciously disregarded a risk of serious harm because he made no effort to enter Ms. Garot's cell to fully examine her or review her full medical chart even though Ms. Garot had obvious head trauma.  (*Id.*)  According to Ms. Garot this is evidence of willful ignorance that rises to the level of deliberate indifference.  (*Id.* at 67.)

Dr. Stewart acknowledged that he uses the DSM which requires psychologists to distinguish medical conditions from psychiatric conditions.  Evidence shows that Ms. Garot presented to Dr. Stewart with significant disorganized thoughts, memory problems, hallucinations, and a poor grasp on reality.  Whether Dr. Stewart's standard of care is set by the DSM, and whether that standard required him to take further steps to rule out a medical condition as the cause of these symptoms, are triable issues of material fact.

Furthermore, Dr. Stewart's argument that he should be relieved from liability because he was only called on to determine whether there was a psychiatric emergency is unpersuasive.  *See Farmer*, 511 U.S. 825, 843 (1994) ("[A defendant] would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.").  A factual dispute arises as to whether Dr. Stewart used the guise of having the narrow objective of determining Ms. Garot's suicidal propensity to remain willfully ignorant of Ms. Garot's medical status by refusing to verify underlying facts or

declining to confirm an inference of risk.  Thus another genuine dispute of a material fact, Dr. Stewart's mental state, exists and summary adjudication is denied.

### 3.   Dr. Von Lintig

Dr. Von Lintig, like the other Defendants, argues that her course of action was medically acceptable and that she lacked the requisite state of mind.  (ECF No. 165-1, at 26–27.)  Dr. Von Lintig maintains that she completed a full evaluation under the circumstances, which included evaluating Ms. Garot's gait, the ability to move her limbs, whether her speech was slurred, and her level of consciousness.  (*Id.* at 26.)  Dr. Von Lintig asserts that these findings, in combination with her later efforts to further review Ms. Garot's medical record, show that she subjectively took Ms. Garot's medical condition into consideration and reasonably ruled out an immediate concern.  (*Id.*)  The crux of Dr. Von Lintig's arguments is that Ms. Garot was an add-on patient and therefore Dr. Von Lintig had very limited information and could not have been aware of Ms. Garot's past symptoms.  (*Id.*)  Regarding the concerning behavior that Dr. Von Lintig personally observed, Ms. Garot was in a safety cell during Dr. Von Lintig's evaluation which is usually a place for psychiatric patients.  (*Id.*)  Thus Dr. Von Lintig concludes that it was not unusual for Ms. Garot to exhibit bizarre behavior, and it was not clear that the symptoms of a subdural hematoma were present.  (*Id.* at 27.)  For these reasons Ms. Garot's presentation was not objectively consistent with a subdural hematoma and Dr. Von Lintig's actions could not be considered deliberately indifferent.  (*Id.*)

Ms. Garot counters that Dr. Von Lintig's purpose in seeing Ms. Garot was to assess acute medical concerns in light of symptoms indicating a serious medical condition, and yet she made no effort to enter Ms. Garot's cell or obtain a medical history on Ms. Garot.  (ECF No. 191, at 69–70.)  Based on this, Ms. Garot argues that a reasonable jury could find that Dr. Von Lintig acted with conscious disregard to a substantial risk of harm.  (*Id.* at 70.)  Even if a jury were to credit Dr. Von Lintig's statement that she was unable to enter the safety cell, Ms. Garot says that there was still no basis for Dr. Von Lintig's failure to review medical records, request that Ms. Garot be

moved to medical, or call 911.  (*Id.*)  Dr. Von Lintig chose to provide no treatment after personally observing confusion, delusion, and a raccoon eye that Ms. Garot characterizes as a textbook example of deliberate indifference.  (*Id.* at 72.)

Dr. Von Lintig's motion for summary adjudication on Ms. Garot's deliberate indifference claim is denied for substantially the same reasons that the Court denied NP Dela Cruz and Dr. Stewart's motions.  By the time Dr. Von Lintig evaluated Ms. Garot, she was uncooperative and speaking to an invisible third person.  Dr. Von Lintig also took note of Ms. Garot's black eye although she was unable to observe the abrasions on Ms. Garot's forehead.  It is a question for the jury whether these facts are sufficient to create an inference that Ms. Garot was at a substantial risk of harm, and whether Dr. Von Lintig drew such an inference but chose not to take further action despite its existence.  A triable issue also exists as to what the medically acceptable response to such symptoms would be, and whether Dr. Von Lintig's course of treatment fell in line with that standard.  Dr. Von Lintig's argument that Ms. Garot was merely an add-on patient and Dr. Von Lintig did not have access to her medical records does not foreclose the possibility that a jury could find that Dr. Von Lintig's actions were medically unacceptable based simply on the symptoms she observed.  Therefore, Ms. Garot's presentation, whether her symptoms indicated a substantial risk of harm, and whether Dr. Von Lintig was aware of the risk yet did nothing are all triable issues of fact that prevent the Court from entering summary adjudication.

Dr. Von Lintig also challenges the causation between her actions and Ms. Garot's injuries in stating that even if she called 911 during her initial evaluation, Ms. Garot would still have ended up in the same condition.  (ECF No. 165-1, at 27.)  But Ms. Garot points out that there is a dispute as to the timeline within which she collapsed, stopped moving, and became comatose and a jury could conclude that Dr. Von Lintig could have assisted Ms. Garot.  (ECF No. 191, at 72.)  In any event, Ms. Garot claims that the constitutional injury occurred the moment Dr. Von Lintig denied Ms. Garot medical care causing further pain and suffering in violation of the Eighth Amendment.  (*Id.* at 73.)

1   The Court agrees with Ms. Garot.  There was a two-hour time period between Dr.

2   Von Lintig's examination of Ms. Garot and when EMS was called.  Ms. Garot collapsed

3   at some point within those two hours.  Exactly when Ms. Garot collapsed and when her

4   injuries reached an irreversible point of severity are disputed facts that are material in

5   determining causation and will require medical expert testimony to resolve.  Ms. Garot

6   has presented expert testimony that her injuries became irreversible at some point in

7   those two hours which does not rule out the possibility that there was time for Dr. Von

8   Lintig to change the outcome.   (*See* Lobatz Dep., at 63.)  A reasonable jury could

9   conclude, based on expert testimony, that Dr. Von Lintig caused Ms. Garot's injuries by

10  delaying emergency medical help.  Summary adjudication is denied as to Dr. Von

11  Lintig's alleged deliberate indifference.

12      **B.    Professional Negligence**

13      All Defendants argue that Ms. Garot's claims for professional negligence fail as a

14  matter of law, basing these arguments on the same allegations that form the foundations

15  for the deliberate indifference claims.  (ECF No. 165-1, at 28–30; ECF No. 171-1, at 21–

16  22.)  Having found that there are genuine disputes of material fact going to whether the

17  Defendants' actions were medically acceptable, the Court finds that the same disputes

18  arise in determining whether Defendants' actions fell below the standard of care for

19  purposes of establishing negligence, a much lower standard.  *See Lemire*, 726 F.3d at

20  1081–82 ("The indifference to a prisoner's medical needs must be substantial.  Mere

21  'indifference,' 'negligence,' or 'medical malpractice' will not support this claim."

22  (quotation omitted)).  Summary adjudication of Ms. Garot's professional negligence

23  claims is denied.

24      **C.    Vicarious Liability**

25      CCMG argues that it may be dismissed if the claims against Dr. Von Lintig and

26  NP Dela Cruz are dismissed.  (ECF No. 165-1, at 30–31.)  Liberty argues in a similar

27  fashion that it cannot be vicariously liable if Dr. Stewart is not liable and should be

28

dismissed if the claims against Dr. Stewart are dismissed.  (ECF No. 171-1, at 22.)  Ms. Garot does not address, and therefore does not dispute, these assertions.

In light of this Order, there has yet to be a finding of liability or lack thereof on these matters.  Therefore CCMG and Liberty's arguments that they may be dismissed if Dr. Von Lintig, NP Dela Cruz, and Dr. Stewart are absolved of liability is rejected as premature and summary adjudication of this issue is denied.

### D.  **Punitive Damages**

Ms. Garot seeks punitive damages against, Dr. Stewart, Dr. Von Lintig, and NP Dela Cruz relating to her claims for deliberate indifference.[22]  (ECF No. 53, at 22.)  These Defendants argue that Ms. Garot is not entitled to punitive damages because they lacked the requisite mental state.  (*See* ECF No. 165-1, at 29–30; ECF No. 171-1, at 20–21.)  Ms. Garot did not address punitive damages in her opposition.

In § 1983 cases, punitive damages are recoverable "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Smith v. Wade*, 461 U.S. 30, 56 (1983).  "Conduct is in reckless disregard of the plaintiff's rights if, under the circumstances, it reflects complete indifference to the plaintiff's safety, rights, or the defendant acts in the face of a perceived risk that its actions will violate the plaintiff's rights under federal law."  *Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005) (quoting 9th Cir. Model Civ. Jury Instr. 7.5 (2004)).

While Ms. Garot does not dispute the argument that she is not entitled to punitive damages, for the reasons stated above with respect to Ms. Garot's deliberate indifference claims, the Court finds that a reasonable jury could find that Dr. Stewart, Dr. Von Lintig, and NP Dela Cruz acted in reckless disregard of Ms. Garot's rights.  *See Gordon v.*

---

[22] To the extent that CCMG and Liberty move for summary adjudication on the issue of Ms. Garot's claim for punitive damages, the Court denies their motion as moot as Ms. Garot is not seeking punitive damages from them.

*County of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018) (stating that "deliberate indifference" is "akin to reckless disregard"). Therefore, summary adjudication of this issue is inappropriate. *See* Fed. R. Civ. P. 56(a) (allowing courts to grant summary judgment where there is no genuine dispute as to any material fact *and* the movant is entitled to judgment as a matter of law).

## V.   COUNTY OF SAN DIEGO'S CROSS-COMPLAINT

The Court turns to the County's cross-complaint, addressing first the County's motion for summary adjudication on its first crossclaim against Liberty for contractual indemnification then moving to all Cross-Defendants' motions for summary adjudication on the County's second and third crossclaims for equitable indemnification and declaratory relief.

### A.   Contractual Indemnification

Liberty entered into a contract with the County on January 23, 2017, to provide licensed mental healthcare at county jails ("Liberty Agreement"). (ECF No. 209-1, at 2.)[23]  Section 10.1 of the Liberty Agreement provides:

> <u>Indemnity</u>. County shall not be liable for, and Contractor shall defend and indemnify County and the employees and agents of County (collectively "County Parties"), against any and all claims, demands, liability, judgments, awards, fines, mechanics' liens or other liens, labor disputes, losses, damages, expenses charges or costs of any kind or character, including attorneys' fees and court costs (hereinafter collectively referred to as "Claims"), related to this Agreement or the work covered by this Agreement and arising either directly or indirectly from any act, error, omission or negligence of Contractor or its Contractors, licensees, agents, servants or employees; including, without limitation, Claims caused by the sole passive negligent act or the concurrent negligent act, error or omission, whether active or passive, of County Parties.

(*Id.*)  The same provision also states that "Contractor shall have no obligation, however, to defend or indemnify County Parties from a Claim if it is determined by a court of

---

[23] The County provided a joint statement of facts in its reply regarding the motion for summary adjudication of its crossclaim. (ECF No. 209-1, at 2–3.)

competent jurisdiction that such Claim was caused by the sole negligence or willful misconduct of County Parties." (*Id.*)

On September 13, 2019, Ms. Garot filed a second amended complaint against the County in which she alleged acts, errors, and omissions by a Liberty employee that resulted in Ms. Garot's incapacitation. (ECF No. 7.) Due to these allegations, the County tendered a defense to Liberty on April 7, 2020, to which Liberty never replied. (ECF No. 175-2, at 59–60; ECF No. 209-1, at 2.)

It is undisputed that the agreement between Liberty and the County is a valid contract. (*See* ECF No. 209-1, at 2.) The parties also agree that the operative complaint includes claims against Liberty employee Dr. Stewart regarding alleged acts or omissions that proximately caused Ms. Garot's injuries, and that Liberty has not agreed to provide County a defense in connection with such claims. (*Id.* at 3.) The County alleges in its crossclaim that Liberty breached the Liberty Agreement when it declined to provide a defense and seeks contractual indemnification for attorneys' fees and costs the County incurred for its defense in Ms. Garot's lawsuit and to prosecute its crossclaim. (ECF No. 64, at 6–7, 9.) The County now moves for summary adjudication of this claim.[24] (ECF No. 175.)

The County argues that the duty to defend arose immediately while Liberty argues, pursuant to the second sentence of the indemnity clause, that the duty to defend does not arise until a court determines that the claims were *not* caused by the sole negligence or willful misconduct of the County. (*See generally* ECF Nos. 175, 190.) In support of its motion the County cites cases that involve insurance contracts, and Liberty argues that such case law is inapplicable here. (ECF No. 175, at 6–8; ECF No. 190, at 4–8.) While the Court agrees with Liberty's argument, *Crawford v. Weather Shield Mfg., Inc.*, 187

---

[24] The County only moves for summary adjudication concerning Liberty's contractual duty to defend, (ECF No. 175-1, at 2, 7–9), thus the Court only reaches this issue and makes no ruling on the issue of Liberty's contractual duty to indemnify at this time.

P.3d 424, 430 (Cal. 2008) ("Though indemnity agreements resemble liability insurance policies, rules for interpreting the two classes of contracts do differ significantly."), the ultimate outcome favors the County.

Interpretation of indemnification contracts in California is governed by statute. *Crawford*, 187 P.3d at 431 ("If not forbidden by other, more specific, statutes, the obligations set forth in section 2778 [of the California Civil Code] thus are deemed included in every indemnity agreement unless the parties indicate otherwise."). Subdivision 3 of section 2778 provides that the duty to indemnify "embraces the costs of defense against such claims, demands, or liability incurred in good faith, and in the exercise of a reasonable discretion."  Subdivision 4 of section 2778 defines the duty to defend, stating "[t]he person indemnifying is bound, on request of the person indemnified, to defend actions or proceedings brought against the latter in respect to the matters embraced by the indemnity."

The California Supreme Court held that "[t]he duty to defend upon the indemnitee's request, as set forth in subdivision 4 of section 2778, *is* distinct from, and broader than, the duty expressed in subdivision 3 of the statute to reimburse an indemnitee's defense costs as part of any indemnity otherwise owed." *Crawford*, 187 P.3d at 439.  Specifically, "[a] contractual promise to 'defend' another against specified claims clearly connotes an obligation of active responsibility, from the outset, for the promisee's defense against such claims," *id.* at 431, whereas "[o]ne can only indemnify against 'claims for damages' that have been resolved against the indemnitee, i.e., those as to which the indemnitee has actually sustained liability or paid damages," *id.* at 435.  Put simply, the duty to defend may demand reimbursement of costs to defend against claims that ultimately do not bring about liability and thus do not trigger the duty to indemnify.  *Id.* at 432.

The duty to defend "arises immediately upon a proper tender of defense by the indemnitee, and thus before the litigation to be defended has determined whether indemnity is actually owed."  *Id.* at 434.  Further, "under subdivision 4 of section 2778,

19-cv-1650-L-BLM

claims 'embraced by the indemnity,' as to which the duty to defend is owed, include those which, at the time of tender, *allege* facts that would give rise to a duty of indemnity." *Id.*  Language in the contract absolving the duty to defend or indemnify for the indemnitee's sole negligence or intentional misconduct does not alter the timing or scope of the duty to defend.  *See id.* at 431 (finding the duty to defend arose immediately and was not dependent on indemnitor's ultimate obligation despite the prohibition on indemnification for indemnitee's "sole negligence or willful misconduct").

The Court concludes that Liberty owes a contractual duty to defend the County against the claims brought by Ms. Garot.[25]  Ms. Garot's claims against Liberty and Dr. Stewart for deliberate indifference and professional negligence gave rise to a potential duty of indemnity under the contract because the claims were based on alleged acts, errors, omissions, or negligence of Liberty's employee.  Such claims triggered the duty to defend when the County tendered its defense on April 7, 2020, and Liberty breached this duty when it refused to render or fund a defense on the County's behalf.  As a result, the County is entitled to all previous and future attorneys' fees and costs incurred in defending Ms. Garot's lawsuit arising from Liberty and Dr. Stewart's alleged conduct beginning April 7, 2020.  *See Crawford*, 187 P.3d at 555 ("Where the indemnitor has breached this obligation, an indemnitee who was thereby forced, against its wishes, to defend itself is entitled to reimbursement of the costs of doing so.").  The County is also entitled to attorneys' fees incurred in prosecuting this crossclaim.  *See also id.* at 550, 569 (affirming lower court decision that allowed indemnitee to recover costs to prosecute its crossclaim for contractual indemnification).  Summary adjudication of the County's crossclaim against Liberty for contractual indemnification is granted.

---

[25] Under the language of the contract, Liberty's contractual duty to defend will be terminated upon a Court finding that Ms. Garot's claims were caused by the sole negligence or willful misconduct of the County Defendants.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### B.    Equitable Indemnification

All Cross-Defendants argue that the County is not entitled to equitable indemnification because the County's crossclaim is based on the Cross-Defendants' alleged professional negligence, and the County did not designate any experts in this case as required by California law.  (ECF No. 168-1, at 8–9; ECF No. 172-1, at 7–8.)  This argument is unavailing.

"The elements of a cause of action for equitable indemnity are (1) a showing of fault on the part of the indemnitor and (2) resulting damages to the indemnitee for which the indemnitor is equitably responsible." *C.W. Howe Partners Inc. v. Mooradian*, 256 Cal. Rptr. 3d 806, 816 (2019).  The County need not prove the elements of professional negligence.  That burden lies instead with Ms. Garot who actually brought a claim for negligence in front of the Court, unlike the County.  Thus the County was not required to designate experts in order to succeed on its claim for equitable indemnification.

Moreover, the doctrine of equitable indemnification "applies only among defendants who are jointly and severally liable to the plaintiff." *BFGC Architects Planners, Inc. v. Forcum/Mackey Constr., Inc.*, 14 Cal. Rptr. 3d 721, 723 (2004).  There has been no finding of liability thus far.  It follows that liability for Ms. Garot's injuries is a material issue of fact that precludes summary adjudication of this issue.

The Cross-Defendants also argue that the County is not entitled to equitable indemnification from the physicians or their employers if the physicians are not found to be liable.  (ECF No. 168-1, at 9–10; ECF No. 172-1, at 8–9.)  The County does not dispute this assertion, (ECF No. 188, at 4; ECF No. 189, at 4), and the Court agrees.  *See Children's Hosp. v. Sedgwick*, 53 Cal. Rptr. 2d 725, 729 (1996) ("[T]here can be no indemnity without liability.").  But a material issue of fact still exists as to liability, so summary adjudication on this point is inappropriate.

The Cross-Defendants additionally assert that the County is not entitled to attorneys' fees or costs in connection with its crossclaim.  (ECF No. 168-1, at 10–12; ECF No. 172-1, at 9–11.)  The County is only seeking attorneys' fees and costs regarding

its crossclaim for breach of contract which is addressed above.  (*See* ECF No. 64, at 9.)  It follows that summary adjudication as to attorneys' fees and costs relating to the second and third crossclaims is denied.

### C.   <u>Vicarious Liability</u>

Cross-Defendants CHMA, CCMG, Dr. Von Lintig, and NP Dela Cruz make the additional argument that the County is not entitled to recovery from CHMA because CHMA did not employ or contract with any healthcare providers to provide medical services within the San Diego County jails.  (ECF No. 168-1, at 10.)

They assert that CHMA was not a party or defined as a party in any contract with the County regarding the provision of medical services, and only CCMG provided in house medical services to the San Diego County jails.  (*Id.*)  Therefore CHMA cannot be held liable as the principal or employer of any healthcare provider at issue in this case. (*Id.*)

The County responds that it is entitled to recovery from CHMA based on vicarious liability, particularly the alter ego doctrine and principles of agency law.  (ECF No. 188, at 5.)  To support its alter ego theory, the County identifies a contract between contractor Tri-City Medical Center and the County which discusses CHMA's agreement to provide on-site physicians at the County jails.  (*See* ECF No. 168-2, at 30.)  As further evidence of an alter ego scenario, the County points out that CHMA's chief executive officer, Mark O'Brien, DO, is also the chief executive officer of CCMG.  (ECF No. 188, at 5.)  In any event, the County states, CHMA utilized CCMG and its employees and contractors as agents to perform work under CHMA's agreement with the County at CHMA's direction, subjecting CHMA to vicarious liability.  (*Id.*)

"Alter ego is essentially a theory of vicarious liability under which the owners of a corporation may be held liable for harm for which the corporation is responsible where, because of the corporation's utilization of the corporate form, the party harmed will not be adequately compensated for its damages."  *Doney v. TRW, Inc.*, 39 Cal. Rptr. 2d 292, 294 (1995) (citing *Mesler v. Bragg Mgmt. Co.*, 702 P.2d 601, 606, 608–09 (Cal. 1985)).

"A parent corporation may be deemed the 'alter ego' of its subsidiary corporation only if there is 'such unity of interest and ownership that the separate personalities of the subsidiary and the parent] no longer exist' *and* it appears that 'if the acts are treated as those of the subsidiary alone, an inequitable result will follow.'" *Id.* at 293 (quoting *Mesler*, 702 P.2d at 606).

On the other hand, in California an agency is either actual or ostensible. Cal. Civ. Code § 2298. An agency is actual when "the agent is really employed by the principal," and ostensible when "the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him." *Id.* at §§ 2299, 3000. Actual agency arises when "the principal's conduct causes the agent reasonably to believe that the principal consents to the agent's act on behalf of the principal." *Rogers v. Roseville SH, LLC*, 290 Cal. Rptr. 3d 760, 767 (2022) (citing *Tomerlin v. Canadian Indemnity Co.*, 394 P.2d 571, 574 (Cal. 1964)).

On the issue of CHMA's potential liability, or lack thereof, the moving Cross-Defendants met their initial burden of production. *See Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000) ("Under the federal standard a moving defendant may shift the burden of producing evidence to the nonmoving plaintiff merely by 'showing'—that is, pointing out through argument—the absence of evidence to support plaintiff's claim."). But the County put forth evidence that raises a genuine issue of material fact by citing to the contractual agreement between Tri-City Medical Center and the County. The contract is evidence of a potential alter ego or agency relationship between CHMA and CCMG. To determine the existence of either type of relationship the Court must engage in a fact-specific analysis that looks to, for example, the personalities and treatment of the two separate entities, or the reasonable beliefs of involved parties. The intricacies of the relationship between CHMA and CCMG remain questions of fact that prevent summary adjudication on CHMA's potential liability.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## VI.   <u>CONCLUSION</u>

For the reasons stated above, the County's motion for summary adjudication of its crossclaim against Liberty for contractual indemnification, (ECF No. 175), is **GRANTED** insofar as Liberty breached its contractual duty to defend, entitling the County to reimbursement for attorneys' fees and costs the County has incurred and incurs in the future in defending Ms. Garot's lawsuit and prosecuting its crossclaim against Liberty.  Cross-Defendants' motions for summary adjudication on the County's cross-complaint, (ECF Nos. 168, 172), are **DENIED**.  Defendants' motions for summary adjudication on Ms. Garot's claims, (ECF Nos. 165, 171), are **DENIED**.

**IT IS SO ORDERED.**

Dated:  March 30, 2023

Hon. M. James Lorenz
United States District Judge

19-cv-1650-L-BLM